UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

Case No. ___ : _____-cv-____-____

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

SAPERE WEALTH MANAGEMENT, LLC and
SCOTT TREASE,

Defendants.

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The plaintiff, Securities and Exchange Commission ("Commission"), files this Complaint against Defendants Sapere Wealth Management, LLC, ("Sapere") and Scott Trease ("Trease") and alleges the following:

### SUMMARY

1. In May 2019, Scott Trease and his investment advisory firm, Sapere, recommended that three of their advisory clients invest a total of $7.3 million in two risky, alternative-investment deals that Defendants incorrectly believed were collateralized by a gold safekeeping receipt (SKR).

2. These investments came to Defendants through a self-described financier, whom Trease had befriended in Bible study. Defendants had decided to work with this self-described financier to explore supposed alternative-investment opportunities that the financier or his associate identified.

1

3. From 2018 through early 2019, this self-described financier had presented Trease with several other investment opportunities. Those opportunities had consistently fallen apart, but raised red flags that this vein of alternative-investment opportunities would be unsuitable for Defendants' advisory clients.

4. Trease and Sapere did not reasonably understand these May 2019 investments and thus lacked a reasonable basis to recommend them to their clients.

5. In one of the investments that Trease and Sapere recommended in May 2019, a client ultimately lost $2.3 million. In the other, Defendants placed $5 million of client funds at risk, though Defendants and Individual 1 ultimately (and belatedly) secured the funds' return.

6. By recommending investments to clients without a reasonable understanding of them, and in the face of red flags suggesting the investment might not be suitable, Sapere and Trease breached their fiduciary duties of care, in violation of Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(2)].

## JURISDICTION AND VENUE

7. The Commission brings this action pursuant to Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and (e)] to obtain injunctive relief and civil penalties. The Commission further seeks any other relief the Court may deem just and appropriate pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78i(d)(5)].

8. The Court has jurisdiction over this action under Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

9. Venue is proper in this District under Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain acts or practices constituting the violation of the federal securities laws alleged

herein occurred within this District. In addition, Sapere is headquartered in this District; and both Defendants transact business here.

## THE DEFENDANTS AND OTHER RELEVANT PARTIES

10. Sapere Wealth Management, LLC, is a North Carolina limited liability company headquartered in Matthews, North Carolina. It is an SEC registered investment adviser. For compensation, Sapere advises clients as to the value of securities, or the advisability of investing in, purchasing, or selling securities. According to Sapere's most recent Form ADV, Sapere has over $300 million in regulatory assets under management, which Sapere manages on a discretionary basis.

11. Scott Trease resides North Carolina, resided in this District at all relevant times, and is Sapere's Managing Member. Trease and his spouse own 100% of Sapere. At all relevant times, Trease served as Sapere's Chief Investment Officer. In that role, Trease (for compensation) advised Sapere clients as to the value of securities, or the advisability of investing in, purchasing, or selling securities. Trease is licensed with the state of North Carolina as an investment adviser representative of Sapere.

12. Aaron Cain McKnight resides in Dallas, Texas. Unbeknownst to Defendants at all relevant times, in 2007 McKnight pled guilty to drug charges and was sentenced to approximately 100 months' incarceration.

13. Individual 1 resides in Trabuco Canyon, California. Unbeknownst to Defendants at all relevant times, in 2008, a federal court sentenced Individual 1 to 33 months' incarceration for felony wire fraud and conspiracy. Per the indictment, Individual 1 "operated a scheme to defraud individuals out of more than $600,000 in 'advance fees'" supposedly necessary for the victims to obtain millions of dollars in loans.

14. Client 1 is a married couple who reside in Texas and who at all relevant times were investment advisory clients of Defendants.

15. Client 2 is a trust. The trustee resides in Florida, and the trust beneficiary resides in North Carolina. At all relevant times, Client 2 was an investment advisory client of Defendants.

16. Client 3 is a trust. The trustee and trust beneficiary reside in Texas. At all relevant times, Client 3 was an investment advisory client of Defendants.

## FACTS

### A. Trease Works with Individual 1 to Find Alternative Investment Opportunities

17. In 2017, Trease attended a July 4th party in his neighborhood, and afterwards he invited attendees to meet for a Bible study. Individual 1 was one such attendee and accepted the invitation. Individual 1 was interested in learning more, and Trease and Individual 1 thereafter developed a friendship over regular Bible study.

18. Individual 1 holds himself out as a financier. Based on Trease's discussions with Individual 1, and on business calls Trease joined between Individual 1 and third parties, Trease concluded that Individual 1 was knowledgeable and sophisticated concerning the financial industry.

19. Individual 1 told Trease that Individual 1 had connections with a group of traders (the "Traders") who transacted in "standby letters of credit" or similar instruments. According to Trease, Individual 1 described the Traders as having badges, similar to government officials, and as being able to obtain records from banks worldwide.

20. Defendants decided to work with Individual 1 to buoy Sapere's business by participating in alternative-investment opportunities involving the Traders. Defendants' and Individual 1's main strategy was for Individual 1 to find businesses that would obtain bank loans,

and then Defendants and Individual 1 would invest the loan proceeds with the Traders for profit.

21. Defendants did not complete a thorough background check on Individual 1. Instead, they conducted a more limited background review, involving for example internet and LexisNexis searches, which did not uncover Individual 1's criminal history.

### B. The Alternative Investment Opportunities Raise Red Flags

22. In 2018 and early 2019, Individual 1 or his associate identified a number of potential alternative-investment opportunities for Defendants to consider. The alternative-investment opportunities were different from any type of transaction Trease and other Sapere personnel had ever been involved with before.

23. Although the alternative-investment opportunities consistently fell apart, Defendants encountered a number of red flags indicating that this vein of alternative-investment opportunities was fraught with risk and thus unsuitable for Defendants' advisory clients.

24. For example, and as Trease knew at the time, multiple potential deals raised concerns and failed due diligence reviews by Sapere's chief compliance officer ("CCO") and outside vendors. In March 2019, for instance, Sapere's CCO wrote the following to Trease about one potential alternative-investment deal: "My gut tells me that something is not right," and the CCO could not "confirm whether this is a legitimate deal…." Defendants ultimately did not pursue this transaction.

25. As another example, Individual 1 reported to Defendants that a potential financing source in one alternative-investment opportunity had tricked Individual 1 and that the expected funding for the deal was not available. Trease expressed relief that they had not consummated a transaction with someone who had proven to be illegitimate.

5

26. As a final example, in or around January 2019, Individual 1 expressed concerns that a third-world regulator might accuse Individual 1 or the Traders of a crime in connection with the alternative-investment endeavor. As Trease testified:

> [Individual 1 said] something to the effect that a lot of these countries that are involved in this trading, for lack of a better term, get mad at each other and these guys with badges . . . get in conflict with other people. And he made the case that -- something about, 'I don't want you to be able to kick me out just because some third world regulator says what I'm doing in London or whatever is a crime when the people in London say it's not a crime,' something like that.

C. **Trease and Individual 1 Form Sapere NuLife Global Redemption Fund**

27. In January 2019, Individual 1 and Trease formalized their alternative-investment business relationship by forming the Sapere NuLife Global Redemption Fund, LLC ("Sapere NuLife"); the formation paperwork and subsequent transaction documents were prepared by Defendants' investment-management counsel. Trease and Individual 1 served as Sapere NuLife's co-owners and co-managers, and Sapere's CCO and chief financial officer (CFO) worked as Sapere NuLife's support staff. Sapere's website displayed Sapere NuLife's logo.

28. Per Sapere NuLife's formation paperwork and operating agreement, the entity's purpose was "[m]anagement of pooled investment vehicle[s]" and "seek[ing] capital formation business opportunities."

29. Under Sapere NuLife's operating agreement, moreover, the entity would engage a Sapere affiliate for which Trease was manager, "to provide due diligence and related services" for "capital formation business opportunities." Also under the agreement, a Sapere affiliate would provide "investment and money management services...." The agreement further provided that Sapere NuLife would engage an Individual-1-related business "for structuring trading-related services…for capital secured in connection with such business opportunities."

6

### D. Defendants Recommend That Client 1 Invest $2.3 Million With McKnight

30. In or around April 2019, an intermediary for McKnight contacted Individual 1 and explained that McKnight was trying to raise money to pay a premium for an insurance policy that would help facilitate a bond offering. Shortly thereafter, Individual 1 referred McKnight to Trease.

31. Trease and McKnight discussed this alternative-investment opportunity. McKnight requested $2.3 million, which McKnight stated was to pay the premium for a policy that would facilitate a $450 million note offering. McKnight promised to repay the $2.3 million, plus a $1 million return out of the note-offering proceeds, within 60 days. In further discussions over the deal, McKnight also agreed that Sapere NuLife would receive a distribution or profit from the transaction.

32. Through a written deed of assignment, McKnight also promised to collateralize the $2.3 million investment using a SKR supposedly representing an interest in gold housed in an Australian vault. McKnight further promised to make one of his businesses a guarantor of repayment, via a written Guarantee Agreement.

33. At the time, the website of the vault that supposedly issued the SKR explained the following about its SKRs: "The Vault can is issue [sic] a safekeeping receipt against for [sic] any asset being held in safe custody at [the Vault]. After conducting authentication, evaluation on the asset [sic], The Vault will issue a Safekeeping Receipt verifying the assets [sic] valuation which can be utilized as collateral and prove [sic] of ownership of the asset."

34. Trease knew nothing about SKRs at the time. Although McKnight provided documentation related to the supposed note offering, Trease did not review those materials. Trease therefore did not know, for example, the name or location of the Colombian insurer that was supposed to receive the $2.3 million premium payment.

35. Sapere's CCO attempted to review the proposed transaction, but encountered challenges. For example, the CCO believed that it would be possible to confirm that an SKR's custodial bank, vault, or depository had done due diligence on the SKR (based on the CCO's experience working for another employer, where he had been responsible for a vault that held SKRs.) The CCO therefore called the SKR's issuing vault in Australia, but the vault would not give any details about the SKR other than to confirm an SKR number the CCO read over the phone.

36. In an effort to address this shortcoming, Defendants through investment-management counsel requested and obtained a letter from McKnight's New York lawyer about the SKR. But the one-page letter did not say the authoring counsel had taken steps himself to validate the SKR. The letter instead stated that McKnight's "Hong Kong counsel" had conducted an "independent review as to authenticity of the SKR and the Gold" and that "[a]ccordingly" the SKR was valid and that McKnight's company owned the gold free of encumbrances for five years.

37. Additionally, the CCO reviewed a balance sheet McKnight had provided for one of McKnight's companies. The balance sheet was not balanced: the purported assets exceeded liabilities and owners' equity. The CCO asked McKnight about the imbalance on the balance sheet, and McKnight referred the CCO to someone else for clarification. But the CCO was never able to get ahold of that person.

38. Before this proposed transaction was consummated, Trease and the CCO discussed the CCO's efforts to review the transaction—including the CCO's inability to get information about the SKR from the vault other than confirming an SKR number the CCO read over the phone.

8

39. Although Defendants' practice was to engage due-diligence consultants to evaluate potential investments involving pooled investment vehicles, and although Defendants had done so on earlier alternative-investment opportunities, Defendants engaged no such consultant to review the potential $2.3 million investment.

40. Trease nonetheless recommended that Client 1 make the $2.3 million investment with McKnight in May 2019.

41. Client 1 would play no active role in the deal; Client 1's expected profits would come solely from the efforts of Defendants, Sapere NuLife, and McKnight.

42. Client 1 accepted Trease's recommendation and agreed to invest $2.3 million in the deal.

43. Client 1's motive in participating in the deal was to obtain the promised $1 million profit. Defendants would benefit from funding the investment with McKnight because Sapere NuLife (a Sapere affiliate and entity Trease co-owned) expected a profit or distribution from the transaction.

44. Sapere and Trease structured the deal as an investment by Client 1 in an LLC: Client 1 would invest the $2.3 million in return for membership units of Sapere NuLife SMT-2, LLC ("SMT-2"), an entity for which Sapere NuLife was a member-manager. Because the transaction was intentionally structured as an investment, the public would view it as an investment.

45. The SMT-2 LLC agreement also provided that SMT-2's profits would be distributed according to a multi-step waterfall formula that prioritized paying Client 1 up to 143.479% of the $2.3 million investment and then entitled Sapere NuLife to the remaining profits.

9

46. SMT-2's operating agreement, and the contracts with McKnight supposedly protecting and guaranteeing the $2.3 million, were the only deal documents. No one prepared any written agreement or term sheet memorializing how McKnight was supposed to use $2.3 million of Client 1's invested funds.

47. Other than this $2.3 million deal and the deal described in Section E below, Trease had never participated in a multi-million dollar transaction in which there was no written agreement or description concerning how the funds would be used.

48. On May 3, 2019, Client 1 made the investment by transferring $2.3 million from Client 1's Sapere advisory account to Sapere NuLife's account. On May 6, Sapere NuLife wired the money to McKnight's business. McKnight materially misappropriated the funds and has never returned any of the $2.3 million.

49. After Client 1 invested the $2.3 million in SMT-2, Client 1 (the husband) performed an internet search about McKnight. He found a news article about McKnight having been involved in a trial that resulted in a hung jury. Client 1 called Trease and asked, "[A]re you aware that [McKnight] had trouble in his past, pretty major trouble." And Trease said "no."

50. The SKR was later determined to be fraudulent; there was no gold protecting the investment (and no other factor reduced the investment's risks). Although Sapere NuLife and SMT-2 sued McKnight and his businesses, McKnight defaulted. Client 1 has not recovered the $2.3 million.

### E. Defendants Recommend That Clients Invest $5 million With the Traders

51. In or around April and May 2019, Defendants sought to raise $5 million that Individual 1 would send to the Traders, who (Trease believed) would then invest the funds in a London rehypothecation market.

10

Case 3:23-cv-00172-MOC-SCR     Document 1     Filed 03/22/23     Page 10 of 18

52. Trease expected that the clients would receive their $5 million back, and potentially a 100% profit, within 60 days, though Defendants prepared no written agreement or term sheet requiring Individual 1 or the Traders to return the money at any time. Nor did Defendants prepare a written agreement or term sheet with Individual 1 or the Traders concerning how Individual 1 or the Traders were supposed to use the $5 million of client funds.

53. Trease also expected that Sapere NuLife would receive a share of the profits from the SMT-1 investment.

54. McKnight again agreed to protect the $5 million investment by providing the (fraudulent) SKR as collateral (via a written deed of assignment) and by making McKnight's business the guarantor of the invested funds via a written Guarantee Agreement.

55. Trease did not know why McKnight offered this supposed protection for the investment—an investment McKnight otherwise had no stake in—other than that Individual 1 had made the arrangement.

56. Trease did not have reasonably detailed knowledge about the Traders who would use $5 million of Sapere Client funds in the London rehypothecation market. Trease did not know where the Traders lived, where they worked, how many there were, or whether they had any securities licenses.

57. Trease also did not understand the London rehypothecation market. He felt that there was a "veil of fog … there that [Trease] did not – was not privy to the internal specific workings of the London rehypothecation market."

58. Defendants again did not engage a due diligence consultant to review the potential $5 million investment.

59. Trease nonetheless recommended to Clients 1, 2, and 3 that they invest a combined total of $5 million in this deal in May 2019.

60. The Clients would play no active role in the deal; their expected profits would come solely from the efforts of Trease, Individual 1, Sapere NuLife, and the Traders.

61. All three Clients accepted Trease's recommendation to invest a total of $5 million in the deal.

62. The Clients' motive for investing in the deal was to generate the promised profits (a possible 100% return within 60 days). Defendants would benefit by funding the investment with the Traders because Sapere NuLife expected a profit share from the investment.

63. Defendants again structured the deal as an investment, i.e., the Clients would invest a total of $5 million in return for membership units of Sapere NuLife SMT-1, LLC ("SMT-1"), of which Sapere NuLife was a member-manager. Because the transaction was intentionally structured as an investment, that is how the public would view the transaction.

64. The SMT-1 operating agreement provided that SMT-1's profits would be distributed according to a multi-step waterfall formula that prioritized paying Clients 1, 2, and 3, "pro rata" up to 200% of their investments and then entitled Sapere NuLife to the rest of the profits.

65. Trease signed letters (on behalf of Sapere NuLife) to each of the Clients promising that their investments would be returned in 60 days, either through a "distribution" of profits from the deal or, if SMT-1 did not have the necessary assets, by relying upon McKnight's gold collateral.

66. To generate cash to fund the SMT-1 investment, Clients 2 and 3 sold securities in the Sapere advisory accounts at a combined loss of over $230,000.

67. To make the investment, all three Clients disbursed a total of $5 million out of Sapere advisory accounts, and the funds were pooled in Sapere NuLife's account.

68. Thereafter, the Clients' investment funds flowed to a Canadian account held by an Individual-1-affiliated entity. Then, the funds moved from account to account in Canada and the United States. Unbeknownst to Defendants, eventually, the $5 million of Sapere Client funds were transferred to an account controlled by a person who had been indicted for a prime-bank conspiracy in 2007 and who had been a fugitive.

69. The $5 million investment was not returned within 60 days.

70. Unbeknownst to Defendants, the SKR was fraudulent; there was no gold protecting the investment (and no other factor reduced the investment's risks).

71. In September 2019, at Defendants' insistence, Individual 1 recovered the $5 million and returned it to Sapere NuLife. Sapere NuLife then repaid Clients 1, 2, and 3 their $5 million investment.

72. In connection with the SMT-1 and SMT-2 securities transactions, Trease acted within the scope of his authority as Sapere's owner, manager, and Chief Investment Officer.

## COUNT I

**Breach of Fiduciary Duty in Violation of Section 206(2) of the Advisers Act**
**(Against Both Defendants)**

73. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 72, inclusive, as if fully set forth herein.

74. Under Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)], Defendants Sapere and Trease owed the Clients fiduciary duties of care. That duty requires, among other things, an advisor to have a reasonable belief that an investment is in a client's best interests before recommending the investment to a client.

13

75. Defendants recommended that Clients 1, 2, and 3 invest in the SMT-1 and SMT-2 transactions, but Defendants did not have a reasonable belief that those investments were in the clients' best interests. Defendants did not understand the SMT-1 and SMT-2 transactions well enough to hold such a belief. And the Defendants had encountered many red flags that belied such a belief.

76. By engaging in the conduct described above, Defendants negligently breached their fiduciary duties of care in violation of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

**PRAYER FOR RELIEF**

Wherefore, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

**II.**

Entering a conduct based injunction with the following terms:

a. For a period of 5 years from the date of this order, Defendants shall not, directly or indirectly, including but not limited to, through any entity owned or controlled by them, make any recommendation to, provide advice to, or exercise discretionary trading authority on behalf of, ("Recommend," "Make a Recommendation," or "Recommendation") any "client" of Defendants (as that term is used in 15 U.S.C. § 80b-6) (collectively, "Clients" and each a "Client") regarding any securities, investment, or debt transaction (collectively "Transaction"), except that this injunction shall not prevent Defendants from:

i. Recommending a Transaction to a Client that consists of buying or selling publicly traded securities (for purposes of this order, "publicly traded security" means any security (including an option on individual securities, and an option on a group or index of such securities) listed, or admitted to unlisted trading privileges, on a national securities exchange) or listed futures (for purposes of this order, "listed futures" means any futures transaction that is conducted on or subject to the rules of a contract market or derivatives transaction execution facility appropriately designated by the Commodity Futures Trading Commission and that is executed or consummated by or through such contract market);

ii. Recommending a Transaction to a Client that consists of buying or selling securities or other interests of an investment company registered with the Commission or of a pooled investment vehicle that invests only in publicly traded securities; or

iii. Recommending a Transaction to a Client if:

    1. Prior to making such Recommendation, Defendants engage a due diligence consultant, which is not an associated person of Defendant Sapere or its affiliates, and in which no such associated person has any ownership, employment, or beneficial interest, ("Due Diligence Consultant") to perform reasonable due diligence on the entities and individuals that the Due Diligence Consultant deems appropriate for due diligence review of the Transaction, such as the underlying issuer, fund, pooled investment vehicle, or other person or entity with which the Client

15

would be transacting, and the Due Diligence Consultant completes such reasonable due diligence; or

2. There was previously performed reasonable due diligence by a Due Diligence Consultant on the entities and individuals that the Due Diligence Consultant deemed appropriate for due diligence review of the Transaction, such as the underlying issuer, fund, pooled investment vehicle, or other person or entity with which the Client would be transacting ("Prior Due Diligence").

b. When making a Recommendation to a Client on a Transaction, Defendants shall inform the Client, if applicable, that a Due Diligence Consultant has, at the completion of the reasonable due diligence, rejected or recommended against the Recommendation (or rendered such a rejection or recommendation in Prior Due Diligence).

c. Within 30 days after the five-year anniversary of this order, Defendants shall certify in writing compliance with the injunction described in paragraphs a and b and their subparts. The certification shall identify the injunction and provide written evidence of compliance in the form of a narrative. The Commission staff may make reasonable requests for further evidence of compliance, and Defendants agree to provide such evidence. The certification shall be submitted to the Associate Regional Director for Enforcement of the Commission's Atlanta Regional Office, with a copy to the Office of Chief Counsel of the Enforcement Division. The narrative shall include the following information for the five-year period of the injunction:

    i.     The name and contact information for all Due Diligence Consultants engaged to review Transactions; and

    ii.     A description of all instances in which Defendants provided a Recommendation to a Client after a Due Diligence Consultant, at the completion of the reasonable due diligence, rejected or recommended against the Recommendation of a Transaction to a Client (or rendered such a rejection or recommendation in Prior Due Diligence).

d. This order does not prohibit Defendant Trease from performing any Transaction in his own personal account.

## III.

Ordering Defendant Trease to pay a civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. 80b-9(e)].

## IV.

Granting such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

RESPECTFULLY SUBMITTED,

/s/ Edward G. Sullivan
M. Graham Loomis (GA Bar No. 457868)
Edward G. Sullivan (GA Bar No. 691140)
Joshua C. Hess (GA Bar No. 371139)
**U.S. Securities and Exchange Commission**
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7612
Facsimile: (404) 842-7679
sullivane@sec.gov

Attorneys for Plaintiff